GERD TOPSNIK, PETITIONER *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 22577–11.          Filed September 23, 2014.

In 2004, P, a German citizen, made an installment sale of
his stock in a U.S. corporation, and he received payments in
2004–09 (years in issue) pursuant to a promissory note
executed in connection with the sale. The 2004 payments con-
sisted of a large downpayment and four smaller, equal
monthly payments, which continued throughout 2005–09. He
filed U.S. individual income tax returns for 2004 and 2005 on
which he erroneously reported identical portions of the gain.
He did not file U.S. returns for 2006–09. R challenged P's
installment sale reporting for 2004 and 2005 and filed sub-
stitutes for returns for 2006–09 on which he included in P's
income appropriate portions of P's installment sale gain. R
alleges that P is liable for income tax deficiencies for 2004 and
2006–09, almost entirely attributable to the gain on his
installment sale of stock, additions to tax under I.R.C. sec.
6651(a)(1) and (2) for 2004 and 2006–09, and an addition to
tax under I.R.C. sec. 6654 for 2005, all of which were included
in a jeopardy assessment pursuant to which R levied on the
installment payments due P in partial satisfaction of P's
liabilities. P alleges that, during the years in issue, he was a
German resident and a U.S. nonresident alien, having "infor-
mally" abandoned his status as a lawful permanent resident
(LPR) (i.e., a resident alien taxable on his worldwide income)
in 2003 and, therefore, was not subject to U.S. taxation pursu-
ant to arts. 4 and 13 of the U.S.-Germany Income Tax Treaty
(treaty). R counters that (1) because P did not formally
abandon his LPR status (obtained in 1977) until 2010, he
remained an LPR during the years in issue and (2) because
he was not taxable by Germany as a German resident during
those years, he was not a German resident under art. 4 of the
treaty. Therefore, he was not exempted from U.S. taxation by
the treaty. P also alleges that, because R moved to dismiss P's
2011 Federal District Court suit to review R's jeopardy assess-
ments and levies encompassing the years in issue, in part, for
improper venue on the ground that P was a resident of Ger-

240

many, R is now judicially estopped from arguing that P was not a German resident during the years in issue.

1. *Held*: Because he did not formally abandon his LPR status pursuant to sec. 301.7701(b)–1(b)(1) and (3), Proced. & Admin. Regs., until 2010, P remained an LPR during the years in issue, taxable by the United States on his worldwide income, including the gain on his 2004 installment sale of stock.

2. *Held*, *further*, LPR status for Federal income tax purposes turns on Federal income tax law and is only indirectly determined by immigration law.

3. *Held*, *further*, because P was not subject to German taxation as a German resident during the years in issue, he was not a German resident pursuant to art. 4 of the treaty and, therefore, is not exempted by the treaty from U.S. taxation during those years.

4. *Held*, *further*, as a U.S. but not a German resident, P is taxable by the United States, pursuant to art. 13, para. 5 of the treaty, on his gain recognized during the years in issue from his 2004 installment sale of stock in a U.S. corporation.

5. *Held*, *further*, because the prior Federal District Court litigation concerned only P's status as a German resident for a year after the years in issue, R is not estopped from asserting that P was not a German resident under the treaty during the years in issue.

6. *Held*, *further*, R's additions to tax sustained except for the I.R.C. sec. 6651(a)(2) addition to tax for 2004, which must be recalculated.

*Charles Herbert Magnuson*, for petitioner.
*Najah J. Shariff* and *Catherine G. Chang*, for respondent.

HALPERN, *Judge*: By notice of deficiency (notice) respondent determined deficiencies and related additions to tax for petitioner's 2004–09 tax years as follows:

*Additions to tax*

| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6654 |
|------|-----------|-----------------|-----------|
| 2004 | $135,316 | $28,893 | --- |
| 2005 | --- | --- | $224 |
| 2006 | 75,167 | 16,913 | --- |
| 2007 | 62,766 | 14,122 | --- |
| 2008 | 61,068 | 13,740 | --- |
| 2009 | 60,858 | 5,477 | --- |

The notice also seeks to impose additions to tax for 2004 and 2006–09 under section 6651(a)(2)[1] (failure to timely pay tax shown on return) but alleges that the "[a]mount cannot be determined at this time."

The issues for decision are (1) whether petitioner was subject to U.S. taxation as a resident alien during the years in issue and (2) if so, whether petitioner is liable for additions to tax under sections 6651(a)(1) (failure to timely file tax return), 6651(a)(2) (failure to pay tax shown on return), and 6654 (failure to pay estimated tax).[2] Petitioner alleges that he was a German resident during the years in issue and, therefore, was exempt from U.S. taxation pursuant to articles 4 and 13 of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital and to Certain Other Taxes, U.S.-Ger., Aug. 29, 1989, 1708 U.N.T.S. 3 (entered into force Aug. 21, 1991), *available at* https://treaties.un.org/doc/Publication/UNTS/Volume%201708/volume–1708–1–29534–English.pdf (U.S.-Germany Treaty or treaty).[3] Petitioner, thus, seeks our determination that there are no deficiencies in, or additions to, tax for the years in issue and that he is entitled to a refund of all payments made by him (for 2004 and 2005) and all amounts collected by respondent pursuant to a jeopardy assessment and levy on the installment pay-

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

[2] In his pretrial memorandum, petitioner alleges that he "is to be granted an allowance of entitlements such as for IRC § 7430 cost and fees and any other further relief a court may deem appropriate under the circumstances", and he seeks "reasonable fees and costs" in both his petition and amended petition. Petitioner's claim for litigation and administrative costs is not timely. *See* Rule 231. In any event, on brief, petitioner has not pursued those claims for relief. Therefore, we consider them to have been abandoned. *See Mendes v. Commissioner*, 121 T.C. 308, 312–313 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").

[3] In response to respondent's argument that petitioner spent more time in the Philippines and Thailand than he did in Germany during the years in issue, petitioner suggests that, if respondent is correct, petitioner was a resident of one or the other and, therefore, exempt from U.S. taxation under U.S. bilateral treaties with those two countries. *See* discussion *infra* note 19.

ments arising out of petitioner's 2004 installment sale of stock.

FINDINGS OF FACT [4]

The parties have stipulated certain facts and the authenticity of certain documents. The facts stipulated are so found, and the documents stipulated are accepted as authentic.

At the time petitioner filed the petition, he resided in Germany.

### Principal Transaction Resulting in Proposed Deficiencies

In 1986, petitioner and another individual organized Gourmet Foods, Inc. (GFI), a California corporation in the business of producing, preparing, purchasing, and selling gourmet foods, with its principal place of business in Rancho Dominguez, California. In 2001, petitioner sued a number of individuals and entities involved with GFI's business for, in effect, maneuvering to prohibit him from cashing in on his investment in the business. The parties to that litigation ultimately settled their dispute. Pursuant to the settlement, on July 30, 2004, petitioner sold his interest in GFI, to GFI, for $5,427,000.[5] The purchase price was paid in installments, a 2004 "down payment" of $1.6 million "less any advances previously made", and monthly payments (pursuant to a promissory note) of $42,500 commencing in October 2004.[6] That arrangement resulted in payments to petitioner of $1.77 million in 2004 ($1.6 million plus four payments of $42,500) and $510,000 (12 × $42,500) in each of the subsequent years in

---

[4] In his answering brief, petitioner does not object to any of respondent's proposed findings of fact. We will, therefore, assume that they are correct except to the extent that they are clearly inconsistent with either evidence in the record or petitioner's proposed findings of fact. *See, e.g.*, *Jonson v. Commissioner*, 118 T.C. 106, 108 n.4 (2002), *aff'd*, 353 F.3d 1181 (10th Cir. 2003); *Bland v. Commissioner*, T.C. Memo. 2012–84, 2012 WL 967651, at *1 n.3.

[5] Presumably, the "sale" was, in substance, GFI's redemption of petitioner's GFI stock.

[6] The settlement agreement states that petitioner received advances before 2004 totaling $766,418, which, pursuant to the terms of the settlement agreement, should have been deducted from the $1.6 million down payment in 2004. The parties have stipulated, however, and the stipulated exhibits confirm, that GFI did, in fact, make a $1.6 million down payment to petitioner in 2004.

issue (2005–09). All of the monthly installment payments were reduced by California withholding taxes. GFI mailed the checks and the yearend Forms 1099–MISC, Miscellaneous Income, to petitioner at his daughter's British Columbia, Canada, address.

*Petitioner's Return Filings for the Years in Issue*

Petitioner filed an untimely 2004 Form 1040, U.S. Individual Income Tax Return, on June 4, 2007. On his 2004 return, petitioner reported $723,600 as the gross sale proceeds from the sale of a capital asset acquired on June 30, 1986, and sold on June 30, 2004, a $99,789 basis for the asset, and net long-term capital gain of $623,811. Petitioner also reported net losses of $73,569 from Gourmet Foods, Thailand, and "Gerd Topsnik Reitershausen" and from "operating a hotel". Petitioner reported his daughter's British Columbia, Canada, address as his home address.

Petitioner untimely filed his 2005 Form 1040 on December 10, 2007. As he did for 2004, petitioner reported net long-term capital gain of $623,811 from the sale of a capital asset acquired on June 30, 1986, and sold on June 30, 2004. Also consistent with his 2004 return, petitioner reported net losses of $61,671 from the same business operations in Thailand and Reitershausen. Petitioner also reported $983 of taxable interest. On that return, too, he reported his daughter's British Columbia address as his home address.

Petitioner did not file Forms 1040 for 2006–09. Consequently, respondent made substitutes for returns (SFRs) for petitioner for those years pursuant to section 6020(b). On each of the SFRs for 2006–09, respondent listed capital gain income of $439,671, provided offsets for the applicable standard deduction and personal exemption, and, for 2006, included $35,700 for "state tax refunds, credits or offsets." Also, for each year, respondent imposed additions to tax under section 6651(a)(1) and (2).

In November 2009, petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 2005 seeking a refund of his tax payments for that year and, in May 2010, he filed Forms 1040NR, U.S. Nonresident Alien Income Tax Return, for 2006–09 showing zero tax due for each of those years.

*Respondent's Adjustments* [7]

Respondent challenges the accuracy of petitioner's 2004 and 2005 installment sale reporting of his gain on the installment sale of his GFI stock. [8]

Respondent first computed the gross profit percentage (GPP) under section 453(c) by dividing petitioner's $4,678,582 total gain on the sale (derived by subtracting petitioner's $748,418 basis for his GFI stock, as determined by respondent, from the total sale price of $5,427,000) by the sale price of $5,427,000, which results in a GPP of 0.8621. Applying the GPP to the total payments petitioner received in 2004 results in installment sale gain of $1,525,917 (0.8621 × $1.77 million) for 2004 and installment sale gain of $439,671 (0.8621 × $510,000 [9]) for 2005–09. Those computations resulted in an increase in petitioner's capital gain

[7] In addition to his capital gain adjustments and imposition of additions to tax under secs. 6651(a)(1) and (2) and 6654, respondent (1) adjusted petitioner's reported itemized deductions for 2004 and 2005, (2) made adjustments to his reported alternative minimum tax (AMT) for 2004 and 2005 and imposed AMT for 2006–09, (3) included taxable interest in his income for 2006, (4) for 2006 and 2007, disallowed expenses subject to the 2% adjusted gross income limitation, and (5) made adjustments with respect to unreported State tax refunds and a deduction for tax preparation fees for 2006. Petitioner disputes all of the adjustments, but solely on the basis that he was exempt from U.S. taxation under the U.S.-Germany Treaty. He does not dispute respondent's computation of the adjustments that give rise to the tax deficiencies. Because the entire discussion by both parties focuses on whether petitioner is required to pay U.S. income tax on the capital gain arising from his installment sale of GFI stock, and because that is by far respondent's largest adjustment and is responsible for the AMT adjustments and the deduction disallowances, we shall limit our discussion of respondent's adjustments to his computation of that gain for each of the years at issue, which, as noted, petitioner appears to accept as accurate. For the same reasons, we shall limit our discussion of petitioner's taxability by the United States to his taxability on that gain.

[8] With exceptions not relevant herein, an installment sale constitutes a "disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Sec. 453(b)(1). The gain from such a sale must be reported under the installment method, i.e., by recognizing as gain for each taxable year in which payments are received "that proportion of the payments received in that year which the gross profit * * * [on the sale or other disposition] bears to the total contract price." *See* sec. 453(a), (c).

[9] This $510,000 is the amount petitioner received annually (12 monthly payments of $42,500) from 2005–09.

income for 2004 of $902,106 ($1,525,917 less the $623,811 gain petitioner reported) and a decrease in petitioner's capital gain income reported for 2005 of $184,140 ($623,811 reported less the $439,671 gain derived by application of the GPP to the $510,000 paid to petitioner during the year).

Because petitioner did not initially file returns or pay tax for 2006–09, respondent's adjustment for each of those years, with respect to petitioner's sale of his GFI stock, was to attribute to petitioner the gain of $439,671 he realized with respect to the $510,000 he received during the year.

### *Jeopardy Assessment, Levies, and Subsequent Litigation*

On March 16, 2011, respondent issued a jeopardy assessment of petitioner's liabilities for taxes, penalties, and interest for the years in issue and, thereafter, levied on the GFI installment payments in partial satisfaction of those liabilities.

On August 23, 2011, petitioner filed a complaint and, thereafter, an amended complaint against the United States in the U.S. District Court for the Central District of California requesting a review of respondent's jeopardy assessments and levies, including the foregoing jeopardy assessment and levies, refunds for 2004 and 2005, and damages for unauthorized collection actions. The defendant United States moved to dismiss the case on several grounds, including improper venue. After noting that petitioner "does not reside in any judicial district since he currently resides in Germany", the District Court held that, under the venue provisions of 28 U.S.C. sec. 1402(a)(1), petitioner "may not file his claim in a district court" and that his "only recourse is to prosecute his claim in the United States Claims Court, which has concurrent jurisdiction over tax refund actions." *Topsnik v. United States*, No. 2:11–cv–06958–JHN–MRW, 2012 WL 10637570, at *1 (C.D. Cal. Jan. 17, 2012), *aff'd*, 554 Fed. Appx. 630 (9th Cir. 2014) (*Topsnik I*). On that basis, the District Court granted defendant's motion to dismiss. *Id.* [10]

_____

[10] Following the District Court's dismissal of petitioner's suit due to improper venue and while petitioner's appeal of that ruling was pending before the Court of Appeals for the Ninth Circuit, petitioner brought suit for refund in the Court of Federal Claims. The defendant United States moved

*Petitioner's Ties to the United States*

On January 25, 1977, petitioner applied for and, on February 3, 1977, was issued a Form I–551, "Resident Alien" card (green card), thereby becoming a "lawful permanent resident" (LPR) of the United States and, hence, a resident alien taxable on his worldwide taxable income.[11] Also, in 1977, petitioner moved from Calgary, Canada, to Honolulu, Hawaii.

On November 21, 2002, petitioner flew from Frankfurt, Germany, to San Francisco International Airport where he presented himself as a returning LPR. At that time he signed and submitted to the Department of Justice Immigration and Naturalization Service (INS) an affidavit stating, in part, that (1) the purpose of his trip to the United States was to return home to Honolulu where he had been residing since 1977, (2) he was a partner in GFI, and (3) he traveled every six weeks on business in connection with a company that he owned in Thailand and properties in Germany and Thailand. At that time he also listed "U.S.A." as his country of residence on a customs declaration.

On March 3, 2003, petitioner renewed his LPR status by filing a Form I–90, Application to Replace [Expiring] Permanent Residence Card, on which he listed his status in the United States as "Permanent Resident—(Not a Commuter)" and his U.S. mailing address as 2938 Pacific Heights Road in Honolulu. His application for renewed LPR status through March 1, 2014, was approved by the INS on March 1, 2004. Petitioner retained his LPR status until November 20, 2010, when he abandoned it by filing a U.S. Citizenship and Immigration Services (USCIS) Form I–407, Abandonment of Lawful Permanent Resident Status, on which he stated that his "intended or actual permanent residence abroad" would

to continue a temporary stay of the case pending the outcome of petitioner's appeal of the District Court ruling. The Court of Federal Claims denied the motion on the ground that there was no venue issue before it, and that, whatever disposition the Court of Appeals were to make of petitioner's appeal, it would retain subject matter jurisdiction over petitioner's refund claim and, therefore, could proceed to address the merits of that claim. *See Topsnik v. United States*, 114 Fed. Cl. 1 (2013) (*Topsnik II*).

[11] *See* sec. 7701(b)(1)(A)(i) (codifying the resident alien status of a lawful permanent resident for taxable years beginning after 1984); sec. 1.1–1(a)(1), (b), Income Tax Regs.

be in the Philippines, and he surrendered his green card to the USCIS.

Petitioner sold his Hawaiian residence in 2003, but the new owner continued to let him list it as a home address when registering at hotels, and he continued to receive mail there, which the new owner forwarded to him.

*Petitioner's Ties to Germany*

Petitioner was born in Germany and has a German driver's license and a German passport. Beginning in 1964, petitioner had access to a room in his brother's house in Freiburg, Germany, where he stays and has in the past stayed on frequent occasions. In 2002, petitioner purchased a small inn in Oerlenbach, district of Rottershausen, Germany. One of the rooms at the inn was always available to him, and he stayed in that room, during the years in issue, whenever he was there. The inn was some 400 kilometers from Freiburg. Also, during all or a part of that period petitioner owned an old farmhouse and farm; some industrial or commercial properties in the former East Germany, which remain undeveloped and are still held by petitioner for potential gain; and a small "cafhouse" in Markelsheim, Germany. According to petitioner's own logbook entries for five of the six years in issue, he was physically present in Germany for a total of 98 days in 2005, 92 days in 2006, 44 days in 2007, 40 days in 2008, and 14 days in 2009.

In response to a request by the U.S. competent authority to his German counterpart under article 26 of the U.S.-Germany Treaty (article 26: "Exchange of Information and Administrative Assistance"), the latter, pursuant to a letter dated May 4, 2011, furnished the following information regarding petitioner's contacts with Germany during the years in issue, which he, in turn, had obtained from German tax authority records:

(1) Petitioner was not registered in the community of Oerlenbach, the situs of the aforementioned inn. Therefore, he failed to establish residency in that community. [12]

---

[12] A member of the U.S. competent authority office in Frankfurt, Germany, testified, without objection by petitioner's counsel, that one registers in a particular city or town in order to establish that that is the community in which he intends to become a German resident.

(2) It is not clear whether petitioner had or has a domicile or habitual residence in Germany.

(3) Beginning with the 2002 assessment period, petitioner has been registered with the German tax authority as a taxpayer with limited liability, i.e., as a nonresident individual generally chargeable only on German source income, including income from German assets, a status equivalent to the status, for U.S. tax purposes, of a nonresident alien.

(4) For 2002–04, value added tax returns were submitted with respect to rental income that petitioner collected from customers of the Oerlenbach inn.

(5) In cash basis accounting statements for 2002–04, Oerlenbach inn rental revenues of €4,541.02 were declared for 2002, €1,034.48 for 2003, and €1,879.92 for 2004. No cash basis accounting statements were filed for 2005 and subsequent years.

(6) Petitioner did not file the required tax returns for a limited liability taxpayer despite the German tax authority's repeated requests that he do so. Therefore, the German tax authority estimated the German income tax tax bases for the 2002–08 assessment periods and submitted SFRs on his behalf.

(7) Because the German tax authority did not consider petitioner to be a German resident, it would not have considered the gain on petitioner's installment sale of his GFI stock to be income taxable in Germany, and, in fact, the German tax authority had no record of his filing income tax returns in Germany for 2004 and subsequent years.

*Petitioner's Ties to Thailand*

During the years in issue, petitioner operated a winery business in Thailand called Gourmet Foods Thailand Co. Ltd. During that period, he maintained a bank account in Thailand, spent significant time there visiting with his son, who lived there, and ran his winery business.

*Petitioner's Ties to the Philippines*

During the years in issue, petitioner spent considerable time in the Philippines. In January 2007, petitioner rented premises in the Philippines as a residence for himself and his family, and, on November 20, 2010, when he surrendered his

green card, he listed those premises as his permanent residence. The lease is to run for 10 years, from February 1, 2007, until January 31, 2016.

### Situs of Petitioner's Physical Presence

During the years in issue, petitioner traveled extensively among, and had substantial physical presence in, the Philippines, Thailand, the United States, Canada, Germany, and a number of other countries in Asia and Africa.

### OPINION

### I. *Burden of Proof*

As discussed *infra*, the factual issue before us is whether, during the years in issue, petitioner was a resident of either or both the United States and Germany, as that term is defined under the U.S.-Germany Treaty.

In general, a taxpayer bears the burden of proof. Rule 142(a)(1). However, section 7491(a) shifts the burden of proof to the Commissioner in certain situations if the taxpayer raises the issue, introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, and demonstrates compliance with the applicable requirements of section 7491(a)(2).

Because we base our decision regarding petitioner's status as a German resident during the years in issue upon a preponderance of the evidence, it is not necessary that we assign the burden of proof. *See, e.g.*, *Estate of Black v. Commissioner*, 133 T.C. 340, 359 (2009); *Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005).

### II. *Whether Petitioner Is Subject to U.S. Taxation of His Installment Sale Gain*

#### A. *Applicable Law*

#### 1. *Introduction*

As noted *supra*, petitioner's sole claim is that he was a resident of Germany and a nonresident alien vis-a-vis the United States during the years in issue and, therefore, was exempt, under the U.S.-Germany Treaty, from U.S. taxation of his installment sale gain realized during those years.

## 2. *Applicable Provisions of the Internal Revenue Code and Regulations*

Pursuant to sections 61(a)(3) and 1001(a) and (c), a taxpayer is taxable on gain (amount realized in excess of basis) from the sale or exchange of property in the year of the sale or exchange. The taxpayer may defer recognition of the gain in the case of an installment sale of a capital asset. Such sales are reported under the installment method whereby the gain recognized during the taxable year is that portion of the payment(s) received during the year that is determined by applying thereto the ratio of the gross profit on the sale to the total contract price. *See* sec. 453(c).

As noted *supra*, a U.S. resident alien is taxable by the United States on his worldwide taxable income. Sec. 1.1–1(a)(1) and (b), Income Tax Regs. Section 7701(b)(1)(A)(i) defines a resident alien, "with respect to any calendar year", in pertinent part, as "[a]n alien individual" who is "[l]awfully admitted for permanent residence * * * [and] is * * * [an LPR] of the United States at any time during such calendar year." Section 301.7701(b)–1(b)(1), Proced. & Admin. Regs., defines an LPR as follows:

> Lawful permanent resident.—(1) Green card test.—An alien is a resident alien with respect to a calendar year if the individual is a lawful permanent resident at any time during the calendar year. A lawful permanent resident is an individual who has been lawfully granted the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws. Resident status is deemed to continue unless it is rescinded or administratively or judicially determined to have been abandoned.

Section 7701(b)(6) also concerns the duration of an individual's status as an LPR and provides as follows:

> (6) Lawful permanent resident.—For purposes of this subsection, an individual is a lawful permanent resident of the United States at any time if—
>
> (A) such individual has the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, and
>
> (B) such status has not been revoked (and has not been administratively or judicially determined to have been abandoned).
>
> An individual shall cease to be treated as a lawful permanent resident of the United States if such individual commences to be treated as a resident of a foreign country under the provisions of a tax treaty between the United States and the foreign country, does not waive the

benefits of such treaty applicable to residents of the foreign country, and notifies the Secretary of the commencement of such treatment.

The definitions of resident alien and LPR set forth in section 7701(b)(1)(A)(i) and (6) were enacted as part of the Deficit Reduction Act of 1984, Pub. L. No. 98–369, sec. 138, 98 Stat. at 672. The House Ways and Means Committee report accompanying the House bill (adopted in conference with modifications not pertinent herein), in describing the definition of an LPR set forth in those provisions, states as follows:

> The bill defines lawful permanent resident to mean an individual who has the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, if such status has not been revoked or administratively or judicially determined to have been abandoned. Therefore, an alien who comes to the United States so infrequently that, on scrutiny, he or she is no longer legally entitled to permanent resident status, but who has not officially lost or abandoned that status, will be a resident for tax purposes. [H.R. Rept. No. 98–432 (Part 2), at 226 (1983), 1984 U.S.C.C.A.N. 697, 1166.]

Section 301.7701(b)–1(b)(3), Proced. & Admin. Regs., sets forth the requirements for an administrative or judicial determination of an alien's abandonment of U.S. resident status as follows:

> (3) Administrative or judicial determination of abandonment of resident status.—An administrative or judicial determination of abandonment of resident status may be initiated by the alien individual, the Immigration and Naturalization Service (INS), or a consular officer. If the alien initiates this determination, resident status is considered to be abandoned when the individual's application for abandonment (INS Form I–407) or a letter stating the alien's intent to abandon his or her resident status, with the Alien Registration Receipt Card (INS Form I–151 or Form I–551) enclosed, is filed with the INS or a consular officer. If INS replaces any of the form numbers referred to in this paragraph or § 301.7701(b)–2(f), refer to the comparable INS replacement form number. For purposes of this paragraph, an alien individual shall be considered to have filed a letter stating the intent to abandon resident status with the INS or a consular office if such letter is sent by certified mail, return receipt requested (or a foreign country's equivalent thereof). A copy of the letter, along with proof that the letter was mailed and received, should be retained by the alien individual. If the INS or a consular officer initiates this determination, resident status will be considered to be abandoned upon the issuance of a final administrative order of abandonment. If an individual is granted an appeal to a federal court of competent jurisdiction, a final judicial order is required.

### 3. *Applicable Provisions of the U.S.-Germany Treaty*

The U.S.-Germany Treaty, as applicable to the years in issue, consists of three documents: (1) the original treaty, which was signed in 1989 but which entered into force in 1991, (2) the 1989 protocol executed in 1989 on the same day the treaty was signed and which entered into force contemporaneously with the treaty, and (3) the 2006 protocol, which entered into force on December 28, 2007, and is effective for taxes other than withholding taxes (e.g., for income taxes) as of January 1, 2008. Therefore, the treaty (sometimes, original treaty) as amended by the 2006 protocol (sometimes, post-2006 treaty) is applicable for petitioner's 2008 and 2009 taxable years.

Article 4 of the treaty defines the term "resident" for purposes thereof. Before its amendment by the 2006 protocol, article 4, paragraph 1, provided as follows:

> For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature, provided, however, that
>
>   (a) this term does not include any person who is liable to tax in that State in respect only of income from sources in that State or capital situated therein; and
>
>   (b) in the case of income derived or paid by a partnership, estate, or trust, this term applies only to the extent that the income derived by such partnership, estate, or trust is subject to tax in that State as the income of a resident, either in its hands or in the hands of its partners or beneficiaries.

The 2006 protocol modified article 4, paragraph 1, to read as follows:

> For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature, and also includes that State and any political subdivision or local authority thereof. The term, however, does not include any person who is liable to tax in that State in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State or capital situated therein. [Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital and to Certain Other Taxes Signed on 29th August 1989, U.S.-Ger., Jun. 1, 2006, 2504 U.N.T.S.

90, *available at* https://treaties.un.org/doc/Publication/UNTS/Volume%202504/v2504.pdf.]

Article 4, paragraph 1, of the original treaty, through subparagraph (a) (as applicable to individuals) is identical, in substance, to article 4, paragraph 1 of the post-2006 treaty. Both define a "resident of a Contracting State" to include an individual "liable to tax therein by reason of his * * * [domicile or residence]", and both exclude from the definition "any person who is liable to tax in that State in respect only of income from sources in that State * * * or capital situated therein." [13]

Article 13, paragraph 1 (the same in both the original and post-2006 treaties), provides:

Gains derived by a resident of a Contracting State from the alienation of immovable property * * * [i.e., real property] situated in the other Contracting State may be taxed in that other State.

Article 13, paragraph 2 (also unchanged by the 2006 protocol), provides in pertinent part:

For the purposes of this Article, the term "immovable" property situated in the other Contracting State shall include

\* \* \* \* \* \* \*

(b) shares * * * in a company that is * * * a resident of that other Contracting State, the assets of which company consist or consisted wholly or principally of immovable property situated in such other Contracting State * * *

Article 13, paragraph 5, of both the original and post-2006 treaties provides, for relevant purposes, that gains from the alienation of intangible property (other than the shares referred to in article 13, paragraph 2(b)) "shall be taxable only in the Contracting State of which the alienator is a resident."

---

[13] Article 4, paragraph 2, of the treaty sets forth tiebreaker rules where "by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States". Because, for the reasons stated *infra*, we find petitioner to be a U.S., but not a German, resident for the years in issue, paragraph 2 is not germane to this case. Moreover, even if we were to find that petitioner was a dual resident taxpayer during the years in issue, he failed to follow the required procedures for claiming German residency under the tiebreaker rules of article 4, paragraph 2. *See* sec. 6114; sec. 301.7701(b)–7(b) and (c), Proced. & Admin. Regs.

B. *Analysis*

1. *Petitioner's Status as a U.S. Resident*

Petitioner does not appear to dispute that he became a U.S. LPR (resident alien) in 1977, when he applied for and was issued a green card. Nor does he dispute that he periodically renewed his LPR-resident alien status and did not formally renounce or abandon that status until November 10, 2010, when he filed a Form I–407 and surrendered his green card to the USCIS consistent with the requirements of section 301.7701(b)–1(b)(3), Proced. & Admin. Regs. Petitioner argues, however, that he informally abandoned his U.S. resident status when he sold his Hawaiian residence in 2003 and allegedly moved back to Germany. In support of his argument that one may informally abandon resident alien status, petitioner cites *United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005).

In *Yakou*, the Court of Appeals for the D.C. Circuit affirmed a District Court decision dismissing an indictment charging the defendant with engaging in brokering activities in violation of the Arms Export Control Act and its implementing regulations, the International Traffic in Arms Regulations (ITAR). Among the errors alleged by the Government to have been committed by the District Court was its ruling that the defendant's LPR status changed without formal administrative action by immigration officials so that the defendant was not a "U.S. person", as defined by the ITAR, subject to prosecution for brokering activities. *Id.* at 243. The defendant in that case, while under investigation by Federal agents, left his home in California in 1993, lived in London until 1998, and then returned to his native Baghdad where he lived and worked thereafter, making occasional trips to the United States of short duration to visit his family. He never formally renounced his LPR status by filing Form I–407 with the immigration authorities, and the Board of Immigration Appeals (BIA) had not adjudged that his LPR status had changed. *Id.* at 244. After noting that the controlling statutes and the ITAR "are all silent regarding the manner and the point at which LPR status changes", the court looked to decisions of the BIA for guidance on the issue. *Id.* at 247–248. It found that "[n]umerous BIA decisions express in dicta the BIA's view that LPR status can change

outside the formal adjudicatory process associated with removal." *Id.* at 248. The court distinguished *United States v. Grimley*, 137 U.S. 147, 151–152 (1890), in which the Supreme Court rejected the argument that an individual who had falsified his qualifications for enlistment in the U.S. military could avoid a court-martial for desertion because he was never a soldier subject to court-martial. The Court of Appeals noted that "LPR status [in *Yakou*] turns on immigration law, and the United States fails to show that LPR status operates in a way comparable to the military relationship at issue in *Grimley*." *Yakou*, 428 F.3d at 249.

Correspondingly, LPR status for Federal income tax purposes turns on Federal income tax law and is only indirectly determined by immigration law. Unlike the controlling statutes and the ITAR considered in *Yakou*, the Internal Revenue Code and the regulations are not "silent regarding the manner and the point at which LPR status changes", and they do circumscribe the means by which an LPR may abandon that status for Federal income tax purposes. *See* sec. 7701(b)(6)(B) (LPR continues until "revoked" or "administratively or judicially determined to have been abandoned"); sec. 301.7701(b)–1(b)(1), Proced. & Admin. Regs. ("Resident status is deemed to continue unless it is rescinded or administratively or judicially determined to have been abandoned."); sec. 301.7701(b)–1(b)(3) ("If the alien initiates this determination, resident status is considered to be abandoned when the individual's application for abandonment (INS Form I–407) or a letter stating the alien's intent to abandon his or her resident status * * * is filed with the INS or a consular officer."). The immigration law itself (including the ITAR), which governed the result in *Yakou*, contains no such requirements for abandoning residency status. Therefore, *Yakou* is not on point and does not furnish a basis for petitioner's contention that he abandoned his LPR status before filing a Form I–407 with the immigration authorities on November 20, 2010. For the same reason, the fact that the immigration authorities may deport, or deny reentry to, an LPR under certain circumstances, *see Alaka v. Elwood*, 225 F. Supp. 2d 547, 553 (E.D. Pa. 2002), cited by petitioner, is of no relevance herein.

Nor are the requirements set forth in section 7701(b)(6)(B) and section 301.7701(b)–1(b)(1) and (3), Proced. & Admin.

Regs., for abandoning LPR status vitiated by petitioner's 2003 sale of his Hawaiian residence or by his arguably infrequent visits to the United States thereafter. As is made clear by the House Ways and Means Committee report accompanying the enactment of section 7701(b)(1)(A)(i) and (6), "an alien who comes to the United States so infrequently that, on scrutiny, he or she is no longer legally entitled to permanent resident status, but who has not officially lost or abandoned that status, will be a resident for tax purposes." H.R. Rept. No. 98–432 (Part 2), *supra* at 226, 1984 U.S.C.C.A.N. at 1166. [14]

Petitioner also alleges that, because respondent argued before the District Court in *Topsnik I* that petitioner is a German resident, and because the court dismissed the case for improper venue on that basis, respondent is estopped, under the doctrine of judicial estoppel, from asserting a contrary position in this case.

Judicial estoppel is an equitable doctrine that prevents a party in a judicial proceeding from asserting a position contrary to one that that party has successfully persuaded a court to accept in a prior judicial proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 749–750 (2001); *see also Huddleston v. Commissioner*, 100 T.C. 17, 26 (1993).

In *Topsnik I*, the Government's motion for dismissal was based, in part, on its claim that Mr. Topsnik was a German resident in 2011, the year in which he filed his complaint. In its opinion, the District Court stated: "It is undisputed that Plaintiff [petitioner herein] is a resident of Germany", and, on that basis, granted the Government's motion to dismiss

---

[14] The House Ways and Means Committee explained its rationale for requiring official loss or abandonment of U.S. residency status as follows:

The committee believes that aliens who have entered the United States as permanent residents and who have not officially lost or surrendered the right to permanent U.S. residence should be taxable as U.S. residents. These persons have rights that are similar to those afforded [U.S.] citizens (including the right to enter the United States at will); equity demands that they contribute to the cost of running the government as much as citizens. [H.R. Rept. No. 98–432 (Part 2), at 223 (1983), 1984 U.S.C.C.A.N. 697, 1163.]

Clearly, petitioner, as one who retained (and exercised) the right to enter the United States at will throughout the years in issue, is among the class of individuals targeted by the 1984 legislation.

the complaint for improper venue. In a subsequent proceeding before the District Court for the District of Columbia, *Topsnik v. United States*, 12 F. Supp. 3d 1 (D.D.C. 2013) (*Topsnik III*), the court determined that "the most that the Central District of California held was that the plaintiff was a resident of Germany in 2011 when he filed his complaint in that court or alternatively when the court issued its ruling on January 17, 2012." *Id.* at 7. We agree with that determination. [15] In *Topsnik I*, Mr. Topsnik's status as a German resident during the years in issue herein (2004–09) was not addressed by the parties and was not in issue. Therefore, respondent is not judicially estopped from arguing that petitioner was not a German resident during those years. [16] For the same reason, respondent is not barred by the doctrines of res judicata and collateral estoppel from asserting petitioner's U.S. residency during the years in issue, both of which doctrines petitioner briefly invokes for support.

We find that petitioner was an LPR of the United States (i.e., a resident alien subject to U.S. taxation of his worldwide income) during the years in issue and, therefore a "resident" of the United States as defined by article 4, paragraph 1, of the U.S.-Germany Treaty.

## 2. *Petitioner's Status as a German Resident*

Having found that petitioner was an LPR of the United States during the years in issue, we must sustain respond-

---

[15] We do not reject petitioner's argument on the basis of collateral estoppel because the court, in *Topsnik v. United States*, 12 F. Supp. 3d 1 (D.D.C. 2013) (*Topsnik III*), made clear that its determination that the court in *Topsnik v. United States*, No. 2:11–cv–06958–JHN–MRW, 2012 WL 10637570 (C.D. Cal. Jan. 17, 2012), *aff'd*, 554 Fed. Appx. 630 (9th Cir. 2014) (*Topsnik I*), found only that petitioner "currently resides in Germany" was not essential to its decision. *See Topsnik III*, 12 F. Supp. 3d at 7. Thus, the court's decision in *Topsnik III* lacks one of the required factors for applying collateral estoppel. *See Peck v. Commissioner*, 90 T.C. 162, 166–167 (1988), *aff'd*, 904 F.2d 525 (9th Cir. 1990).

[16] Petitioner also attempts to support his judicial estoppel argument by referring to exhibits attached to respondent's motion to dismiss in *Topsnik I*. Those exhibits, for the most part, supply background information, and one (a series of IRS transcripts relating to petitioner) is, at best, ambiguous regarding the IRS' position with respect to petitioner's residency during the years in issue. In any event, those exhibits cannot be said to alter or expand respondent's actual argument, adopted by the court in *Topsnik I*, that petitioner was a German resident in 2011.

ent's adjustments for those years unless we find that petitioner is exempt from U.S. tax under the U.S.-Germany Treaty. That will be the result if we find that petitioner was also a German resident under article 4, paragraph 1 of the treaty and, pursuant to the tiebreaker rules of article 4, paragraph 2 of the treaty, he is to be considered a German resident.

Aside from his estoppel arguments, which we have rejected, petitioner's claim of German residency rests on his contacts with Germany during the years in issue. Those contacts include a room at his inn in Oerlenbach, a room at his brother's house in Freiburg, his ownership and operation of the Oerlenbach inn, his ownership of a farmhouse, farm, property used for "industrial and various purposes", and a small "cafhouse". Petitioner also alleges that he "views Germany as his center of vital interest, and where he has his country of closer connection and did so for * * * [the years in issue,] [a]ll of which is underscored by petitioner's obligatory and necessary personal German driver's license."

As noted *supra*, with respect to individuals, both the original U.S.-Germany Treaty and the post-2006 treaty limit the definition of a "'resident of a Contracting State'" to individuals "liable to tax therein by reason of * * * [domicile or residence]", and both exclude from the definition "any person who is liable to tax in that State in respect only of income from sources in that State * * * or capital situated therein." Thus, the treaty test for residence in a contracting State is the individual's liability to pay tax to the State as a resident, which, in the case of Germany, means that the individual must be taxable on his or her worldwide income. *See* Staff of J. Comm. on Taxation, Explanation of Proposed Protocol to the Income Tax Treaty Between the United States and Germany, at 9 (J. Comm. Print 2007) ("Individuals resident in Germany are subject to tax on their worldwide income."); Tax Treaties (CCH) para. 3229, p. 77,181. That that is the test for residency under the U.S.-Germany Treaty is confirmed by the commentary with respect to article 4 of the Organization for Economic Cooperation and Development (OECD) Model Double Tax Convention on Income and Capital (1977) (OECD Model Treaty), article 4, paragraph 1 of which is, in all pertinent respects, identical to article 4, paragraph 1, of the original and post-2006

U.S.-Germany treaties.[17] The commentary to article 4 paragraph 1 states, in pertinent part: "As far as individuals are concerned, the definition aims at covering the various forms of personal attachment to a State which, in the domestic taxation laws, form the basis of a comprehensive taxation (full liability to tax)." OECD Committee on Fiscal Affairs, Model Tax Convention on Income and on Capital, at C(4–9) (1997).[18]

Thus, petitioner's recitation of his contacts with Germany during the years in issue is not relevant to his status as a German resident during those years except insofar as they served to subject him to German taxation of his worldwide income. Petitioner does not allege that he is subject to German taxation on his worldwide income, and the evidence in the record is uniformly to the contrary.

As noted *supra*, the information obtained by the German competent authority from the German tax authority reveals that (1) beginning in 2002, petitioner was registered with the German tax authority as a taxpayer with limited liability, taxable only on German source income, (2) petitioner failed to file even the tax returns required of a limited liability taxpayer despite the tax authority's repeated requests that he do so, (3) the German tax authority had no record of his filing income tax returns in Germany for 2004 and subsequent years, and (4) because there was no evidence to indicate that petitioner has or had a domicile or habitual residence in Germany, the German tax authority would not have considered him to be a German resident and, therefore, would not have considered the gain on his installment sale of GFI stock to be income taxable in Germany. There is no

---

[17] Where the parties to a bilateral tax treaty were both OECD members when the model treaty and commentary were drafted (which is the case herein) and the bilateral treaty language is substantially the same as the model treaty language (also the case herein), we have used the model treaty commentary to interpret provisions of the bilateral tax treaty. *See Podd v. Commissioner*, T.C. Memo. 1998–418, 1998 WL 800961, at *4 (and the cases cited thereat).

[18] Subsequent updates of the OECD Model Treaty left unchanged, in all pertinent respects, the article 4, paragraph 1, definition of resident contained in the 1977 OECD Model Treaty as it pertains to individuals. Therefore, the above-quoted commentary with respect to that definition applies to all of the OECD Model Treaties published since 1977. *See, e.g.*, Tax Treaties (CCH) paras. 200.04, 200A.04.

evidence in the record to refute the information obtained by the German competent authority. Therefore, we find that petitioner was not a "resident" of Germany as defined by article 4, paragraph 1, of the U.S.-Germany Treaty.

### C. *Conclusion*

Both parties appear to assume that the right of the United States to tax petitioner's gain on his 2004 sale of GFI stock is governed by article 13, paragraph 5, of the treaty, which grants the country of residence the right to tax gains from the sale of intangible personal property. That assumption implies the parties' agreement that GFI's assets did not consist "wholly or principally of immovable property [i.e., real property] situated in [the United States]", in which event petitioner's gain from his sale of his GFI stock would be taxable in the United States under article 13, paragraphs 1 and 2(b) of the U.S.-Germany Treaty, regardless of petitioner's residence. There is no evidence in the record indicating the extent to which GFI's assets consisted of "immovable property". In the absence of such evidence and because respondent has not argued for the application of article 13, paragraph 2(b), we decide petitioner's taxability on the basis of his residence during the years in issue. We find that petitioner was a U.S. and not a German resident during that period. Therefore, pursuant to article 13, paragraph 5 of the U.S.-Germany Treaty, petitioner is taxable by the United States on his gain recognized during the years in issue from the 2004 installment sale of his GFI stock. [19]

---

[19] In his opening brief, respondent supports his argument that petitioner may not be considered a German resident during the years in issue, in part, by noting that petitioner spent little actual time in Germany and a great deal of time in other countries, in particular, in Thailand, where he operated a winery business and visited with his son, and the Philippines, where, in 2007, he rented a house under a 10-year lease for the ostensible purpose of providing a home for himself and his family. In petitioner's amended opening brief, filed more than a month after respondent's opening brief, petitioner characterizes respondent's references to his travels and activities during the years in issue as an argument that petitioner was a resident of either Thailand or the Philippines during those years, and he concludes that, therefore, he is entitled to the benefits provided by the income tax treaties between the United States and one or the other of those countries. Respondent argues in his reply brief that he has not had an op-

Continued

III. *Additions to Tax*

A. *Introduction*

Respondent determined that petitioner is liable for additions to tax pursuant to sections 6651(a)(1) and (2) and 6654. Respondent has the burden of production with respect to those additions to tax. *See* sec. 7491(c). To meet that burden, respondent must produce evidence showing that the additions to tax are appropriate. *See id.*; *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once respondent satisfies that burden, petitioner has the burden of proof with respect to exculpatory factors such as reasonable cause. *See Higbee v. Commissioner*, 116 T.C. at 446–447.

---

portunity to consider petitioner's argument or whether petitioner's contacts with either Thailand or the Philippines were sufficient to make him a resident of either for any or all of the years in issue. Therefore, he requests that we "not further consider this new issue as it will greatly prejudice respondent." Without addressing respondent's argument regarding timeliness and prejudice, we note that petitioner has failed to prove that his ties to either Thailand or the Philippines were sufficient to make him a "resident" of either country as that term is defined by the United States' tax treaties with those two countries. *See, e.g.*, Convention With Respect to Taxes on Income, U.S.-Phil., art. 3, para. 1(a)(ii), (2) (definition of "resident"), art. 14, para. 2 (treatment of gains), Oct. 1, 1976, 34 U.S.T. 1277, *available at* http://www.irs.gov/pub/irs-trty/philip.pdf; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, U.S.-Thai., art. 4, para.1, Nov. 26, 1996, S. Treaty Doc. No. 105–2 (1997), *available at* http://www.gpo.gov/fdsys/pkg/CDOC–105tdoc2/pdf/CDOC–105tdoc2.pdf. For example, although petitioner has shown that he rented premises in the Philippines in 2007, ostensibly to be used as a residence for himself and his family, he has not shown the number of days in 2007–09 that he actually treated those premises as his residence; and, aside from frequent business trips, during which he stayed in a hotel, he has not shown significant ties to the Philippines before 2007. Nor has petitioner analyzed either treaty to show that residence therein, even if established, would necessarily negate the United States' right to tax petitioner's gain on the sale of his GFI stock. See, e.g., the U.S.-Thai. treaty, art. 13, para. 1, which provides, with exceptions not relevant herein, that "each Contracting State may tax gains from the alienation of property in accordance with the provisions of its domestic law." Therefore, we reject petitioner's suggestion that respondent is barred from taxing that gain pursuant to the United States' tax treaties with either Thailand or the Philippines.

B. *Respondent's Section 6651(a)(1) and (2) and 6654 Determinations*

1. *Analysis*

Section 6651(a)(1) provides for an addition to tax in the event a taxpayer fails to file a timely return (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect. The amount of the addition is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent.

Section 6651(a)(2) provides for an addition to tax for failure to timely pay the amount of tax shown on a return, unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect. The addition is calculated as 0.5% of the amount shown as tax on the return but not paid, with an additional 0.5% for each month or fraction thereof during which the failure to pay continues, up to a maximum of 25%. *Id.* The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply. *See* sec. 6651(c)(1). Pursuant to section 6651(g)(2), SFRs prepared by the Commissioner under section 6020(b) are treated as taxpayer returns for purposes of determining the addition to tax under section 6651(a)(2).

Section 6654(a) and (b) provides for an addition to tax in the event of an underpayment of a required installment of individual estimated tax. Each required installment of estimated tax is equal to 25% of the "required annual payment", which in turn is equal to the lesser of (1) "90 percent of the tax shown on the return for the taxable year (or, if no return is filed, 90 percent of the tax for such year)", or (2) if the individual filed a return for the immediately preceding year, 100% of the tax shown on that return. Sec. 6654(d)(1)(A) and (B). Except in very limited circumstances not applicable herein, *see* sec. 6654(e)(3)(B), section 6654 provides no exception for reasonable cause or lack of willful neglect.

It is undisputed that petitioner's (1) late filing of his 2004 and 2005 returns and failure to file returns for 2006–09, (2) untimely payment of the amount of tax shown on his 2004

return, (3) nonpayment of his tax liabilities as reflected on the SFRs filed for 2006–09, and (4) failure (made clear on the face of his 2005 return) to pay any estimated tax for 2005 demonstrate that respondent has satisfied his burden of production, under section 7491(c), with respect to his imposition of additions to tax under sections 6651(a)(1) and (2) and 6654.

With respect to the additions to tax, petitioner's only argument against respondent's imposition thereof is that he "acted due to reasonable cause and not due to willful neglect." Specifically, he states: "[A]ny amount of additional tax arising from a miscalculation of installment capital gain amounts brought about by the tax return preparer is not to be attributable to petitioner", and further "that nonresident alien filings are a product of instructions from counsel for petitioner, and asserted penalties in this regard are not attributed to petitioner." Petitioner's arguments are unpersuasive. The additions to tax do not relate to the miscalculations of petitioner's capital gain for 2004 and 2005. Nor do they relate to any "nonresident alien filings" (presumably, the zero tax liability Forms 1040NR that petitioner late-filed for 2006–09) by petitioner. If petitioner is attempting to escape the section 6651(a)(1) late-filing penalty by arguing that any and all of his late filings (and nonfilings) were the product of instructions from counsel, and, therefore, not attributable to him, that argument must be rejected as well under the authority of *United States v. Boyle*, 469 U.S. 241, 252 (1985) ("The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing under § 6651(a)(1).").

We note, however, that respondent appears to be overreaching in his imposition of the section 6651(a)(2) addition to tax for 2004. The Form 5278, Statement—Income Tax Changes, attached to the notice computes a $49,358 addition to tax for 2004 under section 6651(a)(2), which is 25% of the $197,433 total amount due for that year. Moreover, in respondent's discussion of petitioner's liability for that addition to tax, respondent states that "petitioner failed to pay the tax due for the 2004, and 2006 through 2009 taxable years by the due dates of the returns." While it is proper to base the section 6651(a)(2) addition to tax on the amounts

due for 2006–09, which are the amounts shown on the SFRs for those years, it is not proper to base it on the amount due for 2004 because petitioner filed a return for that year and "the amount shown as tax" on that return (the late payment of which is the basis for the addition to tax under section 6651(a)(2)) is $62,117, which petitioner paid in two installments: $10,990 on June 4, 2007, with his late-filed 2004 return, and $51,127 on July 5, 2007. Therefore, we direct that, in connection with the Rule 155 computation, respondent compute the section 6651(a)(2) addition to tax for 2004 on the basis of (1) petitioner's late payment of the $62,117 shown on his 2004 return, and (2) the number of months between the due date of that return and the dates of payment.

2. *Conclusion*

We sustain respondent's imposition of additions to tax, with the foregoing caveat regarding his imposition of an addition to tax under section 6651(a)(2) for 2004.

*Decision will be entered under Rule 155*.